UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____9/14/2022____
```

Rebecca Maria Garcia,

                         Plaintiff,

                -against-

Commissioner of Social Security,

                      Defendant.

21-cv-01230 (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE:**

Plaintiff Rebecca Maria Garcia ("Garcia" or "Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") that denied her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Compl., ECF No. 1.) Presently before the Court are the parties' cross-motions, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings. (Pl.'s Not. of Mot., ECF No. 24; Comm'r Not. of Mot., ECF No. 29.) For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is GRANTED and the Commissioner's cross-motion is DENIED.

**BACKGROUND**

**I.**     **Procedural Background**

On or about May 30, 2018,[1] Garcia filed applications for DIB and SSI, with an alleged disability onset date of November 1, 2013. (Administrative R., ECF No. 13 ("R."), 136-48.) Garcia's

---

[1] The applications themselves are dated June 7, 2018, although elsewhere in the record the date of application is listed as May 30, 2018. (R. 11, 132, 136-48.)

date last insured was December 31, 2014.[2] (R. 12, 110.) The Social Security Administration ("SSA") denied her applications on August 14, 2018 and, thereafter, Garcia filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (R. 79, 85.) On October 31, 2019, Garcia appeared for a hearing before ALJ Jason Miller (R. 30.) Garcia was represented at the hearing by attorney Jacques Farhi. (R. 30.) In a decision dated February 12, 2020, ALJ Miller found Garcia not disabled. (R. 8-28.) On December 15, 2020, the Appeals Council denied Garcia's request for review of the decision, making ALJ Miller's decision the Commissioner's final decision. (R. 1-5.) This action followed.

## II.   **Non-Medical Evidence**

Born on August 29, 1957, Garcia was 56 years old on the alleged onset date of November 1, 2013. (*See* R. 142.) Garcia completed a GED and had vocational training as a Credentialed Alcohol Substance Abuse Counselor. (R. 52, 268.) From April 1995 to February 1999, Garcia was a senior counselor at Educational Alliance; from February 1999 to October 2007, she was a supervisor and Acting Director of SuCasa; from July 2008 to October 2009, she was a Counselor Intern at CURA;[3] and from April 2010 to May 2011, she was an Assessment Specialist for NADAP.[4] (R. 169.)

---

[2] To qualify for DIB, a claimant must be both disabled and insured for benefits. 42 U.S.C. § 423(a)(1)(A) & (C); 20 C.F.R. §§ 404.101, 404.120 & 404.315(a). The last date a person meets these requirements is commonly referred to as the date last insured ("DLI"). Therefore, to qualify for DIB, Garcia must prove her disability began on or before her DLI of December 31, 2014.

[3] Garcia also was a Weekend Counselor at Phoenix House from February 1998 to October 1999. (R. 169.)

[4] NADAP is the National Association for Drug Abuse Problems, a private non-profit that helps New Yorkers struggling with substance abuse. *See* NADAP, https://www.nadap.org/who-we-are/ (last visited Sept. 7, 2022).

III.   **Medical Evidence Before the ALJ**[5]

    A.    **Interborough Developmental & Consultation Center Treatment Records**

On May 13, 2018, Garcia saw Licensed Master Social Worker ("LMSW") Michael Dean McArthur at the Interborough Developmental & Consultation Center ("IDCC") for an intake assessment. (R. 301-23.) Garcia reported a history of challenges with addiction and that she lived alone and was feeling isolated and overwhelmed after recently moving to Brooklyn. (R. 301.) Garcia also reported feeling stress related to finding Narcotics Anonymous ("NA") meetings in her new community, as well as financial stress, and that she was struggling with sleep. (*Id*.) Garcia presented with symptoms of a depressed mood, but LMSW McArthur noted a low risk of suicide. (R. 301-302, 305.) LMSW McArthur also noted that Garcia expressed hope for the future, had "positive coping, conflict resolution, or problem-solving skills," and a supportive social network or family in the form of Alcoholics Anonymous ("AA") and NA communities, which she had relied on for many years. (R. 304-05.) Other than participating in AA/NA meetings, Garcia stated that she did not have a social life and denied having meaningful activities. (R. 314.) Garcia reported prior addiction treatment and mental health treatment and stated that she had degenerative joint disease and a history of a compromised kidney. (R. 310, 314.) Garcia indicated that she

---

[5] The record does not contain medical evidence from prior to Garcia's DLI of December 31, 2014. Accordingly, the ALJ found that Garcia was not disabled for purposes of her DIB claim. (R. 14.) Plaintiff does not challenge this finding. Accordingly, the Court focuses on the medical evidence relevant to Garcia's SSI claim. *See Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 488 n.2 (2d Cir. 2012) (noting that the relevant time period for an SSI benefits application is "the date the SSI application was filed, to . . . the date of the ALJ's decision").

previously had been prescribed Trazadone,[6] but was not taking any medications at the time. (R. 315.)

On mental status examination, LMSW McArthur noted that Garcia appeared friendly with euthymic, but moderately depressed mood, full affect and normal thought process, cognition, insight and judgment. (R. 315-18.) In his clinical formulation, LMSW McArthur wrote that Garcia was experiencing symptoms of major depressive disorder (passive suicidal ideation, sad mood and sleep disturbance) which likely were connected to her history of social and family exclusion due to her sexual identity as well as the loss of her father at age five. (R. 319.)  LMSW McArthur further noted that Garcia provided excessive information on intake, which could be a signal of social isolation or possible personality disorder, and that her challenges were amplified by the stress of maintaining recovery from alcohol and heroin. (R. 319.) LMSW McArthur diagnosed major depressive disorder, alcohol use disorder and opioid use disorder and recommended weekly psychotherapy[7] and a psychiatric evaluation. (R. 319-20.)

On July 16, 2018, Garcia presented to Dr. Pamela Siller, M.D., for a psychiatric evaluation. (R. 324-33.) Garcia reported that she previously had been taking Trazodone, as she had always suffered from insomnia and stated that she "needed to go back on [T]razodone." (R. 324.) Garcia reported being frightened about living in her building as she felt it was dangerous and that she was hyper-vigilant and worried that someone would attack her. (*Id*.) She also reported anxiety

---

[6] Trazadone is a "medication [ ] used to treat depression." *Trazodone HCL*, WebMD, https://www.webmd.com/drugs/2/drug-11188/trazodone-oral/details (last visited Sept. 7, 2022).

[7] According to a June 3, 2019 letter from Jenny Nue, a psychotherapist and mental health counselor at IDCC, Garcia had met with her weekly since May 2018, in addition to meeting with Dr. Pamela Siller for medication management. (R. 300.) The Administrative Record does not contain any treatment notes from Nue.

and being more irritable and depressed, having variable concentration and getting less sleep since she had run out of Trazodone. (*Id.*) As for her medical history, Garcia reported that in 2016, she noticed that her kidney was failing, but she did not need dialysis. (R. 325.) She was uncertain about the status of her kidneys. (*Id.*) Garcia also reported that she had alopecia as a symptom of an autoimmune disease, but she did not know the name of the disease. (*Id.*) Dr. Siller noted that Garcia denied any thoughts to attempt suicide. (*Id.*)

On mental status examination, Dr. Siller noted cooperative, calm behavior, euthymic mood, logical/coherent thoughts processes, full and appropriate affect and fair concentration, insight and impulse control. (R. 328-29.) Dr. Siller did not assess of Garcia's short- or long-term memory. (R. 328-29.) Dr. Siller diagnosed major depressive disorder, alcohol dependence and opioid dependence, both in remission, and post-traumatic stress disorder ("PTSD"). (R. 330.) Under psychosocial and contextual factors, Dr. Siller noted that Garcia was low income and under diagnostic formulation, she noted that Garcia had "many psychosocial stressors." (*Id.*) Dr. Siller restarted Garcia on Trazadone and recommended a health coach. (R. 332.)

On August 14, 2018, Garcia presented to Dr. Siller for monthly medication management. (R. 334.) Garcia reported that she was experiencing many stressors, including being told that she owed over $6,000 in rent, and the poor condition of her apartment, which had been causing depression and were impacting her sleep.  (*Id.*) Garcia also reported that she was not sleeping well because she saw a man watching her from her fire escape and that she had lost 40 pounds in a period of six months. (*Id.*) On mental status examination, Dr. Siller noted that Garcia was anxious and sad, but otherwise noted normal findings. (R. 334-35.) On assessment, Dr. Siller noted that Garcia reported hypervigilance, but refused any new medications. (R. 338.) Garcia also

reported that she had doubled her dosage of Trazodone as she had been unable to sleep and Dr. Siller counseled her on the importance of compliance with medication at the prescribed dosage. (*Id.*) Dr. Siller also referred Garcia for a health coach and case manager and recommended a follow up appointment in one month. (*Id*.)

On November 14, 2018, Garcia presented to Dr. Siller for a psychiatric reassessment. (R. 339.) Garcia stated that she did not see Dr. Siller for the past several months because she "had things come up." (*Id*.) She also stated that she had not run out of medications because her primary doctor had been refilling them.[8] (*Id*.) Garcia reported feeling very lonely and reiterated that she had lost weight. (R. 339.) Dr. Siller's evaluation found that Garcia's mood was anxious and she reported symptoms of anhedonia,[9] abnormal energy levels, appetite disturbances, helplessness and sleep disturbances. (R. 342.) Dr. Siller also noted that Garcia's concentration, intellectual functioning, judgment, insight and impulse control all were "good." (*Id*.) Dr. Siller discussed starting Wellbutrin and Cymbalta for depression, as well as for chronic pain, but Garcia declined. (R. 339.) Garcia stated that she would not start any new medication before getting clearance from her primary medical doctor (Dr. Perkins), as she reported that she was told there might be something wrong with her liver. (*Id.*)

Garcia next saw Dr. Siller on December 18, 2018 for monthly medication management. (R. 345.) Garcia reported that she had an epiphany where she decided not to engage in self-pity and had started going to meetings and reduced her smoking. (*Id.*) Garcia stated that she always was sadder around the holidays, but denied suicidal ideation and reported that the Trazodone

---

[8] Garcia's primary care doctor at the time was Dr. Arlene Perkins. *See infra*, Background Section III(B).

[9] Anhedonia is "the inability to feel pleasure." *Rivera v. Comm'r of Soc. Sec*., No. 21-CV-01498 (KHP), 2022 WL 3210441, at *2 (S.D.N.Y. Aug. 9, 2022).

helped her insomnia and depression. (*Id*.) Dr. Siller noted that her mood was euthymic, and her memory was within normal limits for her age. (R. 346.) Dr. Siller also noted that Garcia reported feeling stable on Trazodone; that her symptoms had improved significantly; and that she was considering getting back to work. (R. 349.) Dr. Siller continued Garcia's medications and recommended that she return for a follow-up appointment in one month. (*Id*.)

Garcia returned for her monthly medication management visit with Dr. Siller on January 15, 2019. (R. 350.) Garcia reported stressing over an upcoming trial regarding her housing bills and reported anxiety, but no depression. (*Id*.) Garcia also reported that she had been without her medication for a week, which increased her anxiety and decreased her sleep. (*Id.*) Since her last visit, Garcia had drunk alcohol twice and stated that she realized she drank too much, especially since she had abused alcohol in the past. (*Id*.) Dr. Siller noted that Garcia was anxious, but her mental status examination otherwise documented normal findings. (R. 350-51) Garcia's memory was within normal limits, her concentration was good, her insight was intact and her judgment was fair. (R. 351-52.) Dr. Siller continued Garcia on her medications and noted that she appeared safe to continue as an outpatient. (R. 354.)

On February 12, 2019, Garcia presented to Dr. Siller for monthly medication management. (R. 355.) Garcia reported feeling happy as she had been approved for Single-Room Occupancy Housing for individuals who are HIV positive and have mental health difficulties in a brand-new building in the Bronx. (*Id*.) Garcia reported stressors, including her brother's terminal cancer, but she denied any suicidal ideation and reported that her sleep and appetite were good. (R. 355.) On mental status examination, Dr. Siller identified Garcia's mood as both anxious and

euthymic and her other findings were normal. (R. 355-56.) Dr. Siller continued Garcia's medication and recommended that she follow up in one month. (R. 359.)

On March 12, 2019, Garcia saw Dr. Siller for her next medication management appointment. (R. 360.) Garcia reported that her sleep and appetite were fair. (*Id.*) She also reported that she had made strides with her dying brother, but she was living in despicable conditions. (*Id.*) Her mood was anxious, but other mental status examination findings were normal. (R. 361.) Dr. Siller reiterated her plan/assessment from the previous visit and recommended that Garcia follow up again in one month. (R. 364.)

Garcia saw Dr. Siller again on April 23, 2019 for her monthly medication management visit. (R. 365.) Garcia stated that she was very happy because she signed the lease for her new apartment. (*Id.*) She denied suicidal ideation and any difficulty with sleep, appetite, energy level or concentration. (*Id.*) Dr. Siller noted that Garcia's mood was euthymic and her memory was within normal limits. (R. 366.) Dr. Siller continued Garcia's medication. (R. 369.)

On May 21, 2019, Garcia saw Dr. Siller for medication management. (R. 370.) Garcia reported that her brother had died and she was feeling guilty, but that her sleep, appetite, concentration and energy level were good. (*Id*.) Her mental status examination results were normal. (*Id.*) Dr. Siller noted that her mood was euthymic, and her memory was within normal limits. (R. 371.) Dr. Siller continued her medications and also prescribed a patch for smoking cessation. (R. 374)

Garcia next saw Dr. Siller for medication management on July 10, 2019. (R. 375.) Garcia stated that she ran out of medication after missing an appointment. (*Id.*) She reported that she had been hypervigilant with a great deal of anxiety. (*Id.*) She was upset that her brother was left

by his family in the morgue for three weeks. (*Id*.) Garcia reported drinking twice and blacking out. (*Id.*) She stated she had been taking Advil PM to sleep, but it left her with jitters and shakes. (*Id.*) Dr. Siller noted that Garcia's mood was anxious and sad. (R. 376.) Dr. Siller continued Garcia on Trazodone and discussed the possibility of starting outpatient substance abuse treatment. (R. 379.)

On August 6, 2019, Garcia saw Dr. Siller for her monthly medication management appointment. (R. 413-17.) Garcia reported that she was under a lot of stress because she was getting notices of arrears, but was "maintaining her good humor" and "feeling overall good" and her appetite and sleep were good. (R. 413.) Dr. Siller noted normal findings on mental status examination. (R. 413-14.) Dr. Siller continued Garcia's medications and recommended that she follow up in one month. (R. 417.)

The following month, on September 11, 2019, Dr. Siller noted that Garcia had run out of medication the week prior and was not feeling well physically. (R. 418.) Garcia reported increased anxiety, weakness and fatigue and increased depression around her birthday. (*Id*.) However, Garcia also reported going to the gym and that she had started going to AA meetings again. (*Id*.) Dr. Siller noted her mood was anxious and sad, but other mental status examination findings were normal. (R. 419.) Dr. Siller encouraged compliance with medications and refilled her medication for one month. (R. 422.)

**B.**    **Sunrise Medical Group/Weill Cornell Physician Network**

On October 24, 2018, Garcia saw Dr. Arlene Perkins with Sunrise Medical Group/Weill Cornell Physician Network for a physical.[10] (R. 284-93.) Garcia reported that she had elevated blood pressure when she went to see her therapist, but had refused to go to the emergency room. (R. 284.) She reported feeling at times as if she had a tight hat on her head and that steam was coming from her body. (*Id*.) Garcia also reported some fatigue, hip pain that was increasing with walking and engaging in daily activities and that she needed a refill of Trazadone. (*Id.*)

Dr. Perkins noted that Garcia was positive for arthralgias (thumb pain), unexpected weight change and headaches. (R. 285.) On physical examination, Dr. Perkins noted that Garcia had musculoskeletal tenderness, limped when she walked to the exam table and had decreased range of motion in her right hip. (R. 286.) Dr. Perkins assessed pain in the right hip joint, with a differential diagnosis of osteoarthritis, pain in both hands and thumb pain and referred Garcia for X-rays. (R. 286.) Dr. Perkins also assessed palpitations and referred Garcia for an electrocardiogram ("EKG"), which showed an atrial flutter and abnormal rhythm. (R. 286, 410-11.) Dr. Perkins further assessed alopecia and essential hypertension and referred Garcia for a variety of labs and to dermatology. (R. 286, 293.) In addition, Dr. Perkins gave Garcia a prescription for Trazadone. (R. 293.)

On November 8, 2018, Dr. Gregory Wilde of Lenox Hill Radiology saw Garcia for an X-ray of the left fingers at the request of Dr. Perkins. (R. 407.) Dr. Wilde noted that Garcia had thumb pain and numbness for one month. (*Id.*) The X-ray showed a normal bone mineral density, mild

---

[10] Plaintiff and the ALJ refer to Dr. Perkins' practice as Sunrise Medical Group, which, based upon the medical records, appears to have been part of the Weill Cornell Physician Network. (*See* R. 19, 380, 386.)

spurring at the first IP joint, moderate narrowing of the first carpal metacarpal joint with subchondral sclerosis and osteophyte.[11] (*Id.*) There was no visible fracture or post fracture deformity and soft tissue structures were unremarkable. (*Id.*) Dr. Wilde also performed an X-ray of Garcia's right hand. (R. 408.) Dr. Wilde observed that the bone mineral density in the right hand was normal and joint spaces were preserved. (*Id.*) Dr. Wilde also observed that there was a mild osteophyte at the first IP joint with a small ossicle adjacent to the joint which could represent an intra-articular body or capsular ossification. (*Id.*) Dr. Wilde noted that there was no visible fracture or post fracture deformity and soft tissue structures were unremarkable. (*Id.*)

On November 21, 2018, Dr. Perkins saw Garcia for a follow-up visit. (R. 398-405.) Garcia wanted to receive medication for blood pressure. (*Id.*) Dr. Perkins noted that Garcia had recently relapsed and was back in AA meetings. (*Id.*) On physical examination, Dr. Perkins noted that Garcia was positive for arthralgias, joint swelling and myalgias.[12] (R. 399.) Dr. Perkins assessed Hypertriglyceridemia, but wanted to recheck in two to three weeks when Garcia was not drinking alcohol.[13] (*Id.*) Dr. Perkins also assessed primary osteoarthritis of both hands, abnormal red blood cell indices, elevated liver enzymes and essential hypertension. (R. 399-400.) Dr. Perkins discussed hand exercises and use of a squeeze ball for Garcia's osteoarthritis and prescribed medication for hypertension. (*Id.*)

---

[11] "Osteophytes are bony formations." *Mesimeris v. United States of America*, No. 03-CV-00925 (JS), 2006 WL 148911, at *2 n.2 (E.D.N.Y. Jan. 17, 2006).

[12] "Myalgia describes muscle aches and pain, which can involve ligaments, tendons and fascia, the soft tissues that connect muscles, bones and organs." *Joseph Y. v. Comm'r of Soc. Sec.*, No. 20-CV00319 (LJV), 2022 WL 125821, at *2 n.5 (W.D.N.Y. Jan 13, 2022) (citation omitted).

[13] "Hypertriglyceridemia is an excess of triglycerides in the blood." *Larkin v. Astrue*, No. 12-CV-00035 (WIG) (MPS), 2013 WL 4647243, at *3 n.4 (D. Conn. Apr. 29, 2013) (citation omitted), *report and recommendation adopted in part, rejected in part*, 2013 WL 4647229 (D. Conn. Aug. 29, 2013).

On November 23, 2018, Dr. Robert Uzor of Lenox Hill Radiology saw Garcia for a bilateral hip X-ray at the request of Dr. Perkins. (R. 406.) Dr. Uzor noted a history of bilateral hip pain. (*Id.*) The X-ray showed total hip arthroplasty with no periprosthetic fracture or loosening; normal prosthetic alignment; mild lower lumber degenerative stenosis; preserved left hip joint spaces; mild coxa vara[14] on the left and preserved osseus mineralization. (*Id.*)

**C.    July 27, 2018 Psychiatric Consultative Examination – Dr. Arlene Broska, Ph.D.**

On July 27, 2018, Garcia presented to Dr. Arlene Broska for a consultative psychiatric evaluation. (R. 268.) Garcia stated that she last worked in 2011 and had not been able to work due to homelessness. (*Id.*) Garcia reported she was sad, lonely and stressed; had difficulty falling asleep; frequently had anxiety; felt unsafe where she was living; experienced trauma and always felt frightened. (*Id.*) Garcia also reported difficulty with short-term memory and concentration and wrote notes to herself. (R. 269.) Dr. Broska noted that Garcia had no symptoms of PTSD, other than hypervigilance in some areas. (*Id.*) Dr. Broska noted that there were no symptoms of a thought disorder. (*Id.*) On mental status examination, Garcia's mood was a little anxious, and her attention, concentration, and recent/remote memory skills were mildly impaired. (*Id.*) She could recall three out of three objects immediately and one out of three objects after a delay. (R. 270.) She could recall another object with a category cue. (*Id.*) In her Medical Source Statement, Dr. Broska noted:

> Vocationally, there is no evidence of a psychiatric limitation in understanding, remembering or applying simple directions and instructions. There is evidence for a mild limitation in understanding, remembering, or applying complex directions and instructions, sustaining concentration and performing a task at a consistent pace. There

---

[14] "Coxa vara is [a] deformity of the hip joint caused by an abnormal sharpness of the angle between the neck of the femur (bone of the thigh) and the shaft of the femur." *Andrew S. v. Berryhill*, No. 18-CV-00011 (CR), 2019 WL 5288200, at *5 n.3 (D. Vt. Oct. 18, 2019).

is no evidence of limitation using reason and judgment to make work-related decisions, interacting adequately with supervisors, coworkers, and the public, sustaining an ordinary routine and regular attendance at work. There is evidence for mild limitation in regulating emotions, controlling behavior and maintaining well-being. There is no evidence of limitation maintaining personal hygiene and taking appropriate precautions. The results of the examination appear to be consistent with psychiatric problems and a history of substance abuse but do not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.

(R. 270.)

Dr. Broska diagnosed adjustment disorder with anxiety and depressed mood and diagnosed alcohol use disorder in remission. (R. 270.) Dr. Broska recommended psychiatric intervention and individual psychological therapy for one year and noted that Garcia's prognosis was "fair." (*Id*.)

        **D.**      **July 27, 2018 Internal Medicine Examination – Dr. Allen Meisel, M.D.**

Also on July 27, 2018, Garcia presented to Dr. Allen Meisel for an internal medicine consultative examination. (R. 273.) Garcia reported she had polyarthralgia [15] involving her shoulders, elbows, wrists, hips knees and ankles for many years. (*Id.*) Dr. Meisel referenced an X-ray of September 2013 that showed degenerative changes of the lumbar spine at L2-3 and L3-4. (*Id*.) Garcia reported that she had cervical and lumbar spine back pain for over ten years. (*Id*.) She said she had intermittent numbness in the right third and fourth fingers. (*Id*.) Dr. Meisel reported the following: her cervical range of motion had a flexion of 30 degrees, extension of 20 degrees, rotation of 30 degrees and lateral flexion of 20 degrees. (R. 275.) Garcia was only able to squat 20 percent. (R. 274.) There was no scoliosis, kyphosis or abnormality in the thoracic spine. (R. 275.) The lumber spine showed full flexion, extension, lateral flexion bilaterally and full rotary

---

[15] "Polyarthralgia is defined as pain in two or more joints." *Gaathje v. Colvin*, No. 15-CV-01049 (VLB), 2017 WL 658055, at *11 (D. Conn. Feb. 17, 2017) (internal quotations and citation omitted).

movement bilaterally. (*Id.*) She had a full range of motion (ROM) in her shoulders, elbows, forearms and wrists bilaterally. (*Id.*) The right hip had 90 degrees of flexion, 10 degrees of interior rotation, 20 degrees of exterior rotation, 20 degrees of abduction and 0 degrees of adduction. (*Id.*) The left hip had a full ROM and there was a full ROM of knees and ankles bilaterally. (*Id.*) Her joints were stable and nontender, and there was no redness, heat, swelling or effusion. (*Id.*) Her strength was 5/5 in the upper and lower extremities as well as her grip bilaterally. (R. 275-76.) Dr. Meisel also noted that Garcia's hand and finger dexterity was intact. (R. 276.) Dr. Meisel noted that a right knee x-ray performed the same day was normal, and a lumber spine x-ray, also performed the same day, showed degenerative disc disease at L2-3 and L3-4. (*Id.; see also* R. 277-78.) Dr. Meisel diagnosed polyarthralgia, status post right hip replacement, lumbar back pain secondary to degenerative disc disease and cervical back pain. (R. 276.) Dr. Meisel assessed that Garcia had moderate limitations of standing, walking, climbing stairs, bending and kneeling and marked limitations of heavy lifting and carrying. (*Id.*)

      E.    **August 8, 2018 State Agency Opinion – Dr. A. Lee, M.D.**

On August 8, 2018, Dr. A Lee, M.D. reviewed Garcia's record and opined that she could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and stand, walk, or sit for six hours of an eight-hour workday. (R. 74.)

      F.    **August 7, 2018 State Agency Reviewer – Dr. D. Brown, PsyD**

On August 7, 2018, Dr. D. Brown, PsyD reviewed Garcia's record and opined that she had mild limitations in her ability to understand, remember or apply information and concentrate, persist or maintain pace, but no limitations in interacting with others or adapting or managing oneself. (R. 71.) Dr. Brown noted that based on evidence in the file, Garcia's symptoms were

related to homelessness, but also noted that it was "unclear" how this was consistent with evidence that she had been in a halfway house and, at the time of Dr. Brown's review, was living in an apartment. (R. 71-72.) Dr. Brown noted that Garcia was independent in activities of daily living and "appear[ed] to be able to perform jobs with simple tasks." (R. 71.) Dr Brown indicated that the most recent medical evidence in the record was from January 31, 2017. (R. 71.) He further noted that Garcia reported treatment at IDCC with a therapist and one visit to a psychiatrist "who only put her back on a sleep med[,]" but those records were not in her file.[16] (*Id.*)

### G.     June 26, 2019 Mental RFC Assessment – Dr. Pamela Siller, M.D.[17]

On June 26, 2019, Dr. Siller submitted a Medical Source Statement regarding Garcia's mental impairments. (R. 296-99.) Dr. Siller noted that Garcia has been diagnosed with depressive disorder, alcoholic disorder and PTSD. (R. 296.) Dr. Siller noted that Garcia had poor memory; sleep disturbances; mood disturbances; substance dependence; paranoia or inappropriate suspiciousness; feelings of guilt/worthlessness; social withdrawal or isolation; intensive recollection of a traumatic experience; and hostility and irritability. (*Id.*) Dr. Siller opined that Garcia was "not ready to work." (R. 297.) "Independent of any impairment from alcoholism and/or drug addiction," Dr. Siller further opined that Garcia had a marked loss in her ability to perform basic mental activities of work on a regular and continuing basis, which affected her ability to understand, remember, and carry out instructions. (*Id.*) Dr. Siller found a marked loss

---

[16] Trazodone is an anti-depressant, but sometimes is prescribed off-label as a sleep aide. *See* https://www.healthline.com/health/sleep/trazodone-for-sleep#off-label-prescribing (last visited Sept. 8, 2022).

[17] According to Garcia, the assessment was completed by her therapist and signed by Dr. Siller. (*See* R. 17.)

in the following areas: remembering locations and work-like procedures, dealing with stress or semi-skilled and skilled work, working in coordination with or proximity to others without being unduly distracted, making simple work-related decisions, completing a normal workday or work week without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (R. 298.) Dr. Siller further opined that Garcia had a moderate loss in the following areas: understanding and remembering very short, simple instructions; carrying out very short, simple instructions; understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; and sustaining an ordinary routine without special supervision. (*Id.*) Dr. Siller opined that Garcia had no loss or mild loss in maintaining regular attendance and being punctual. (*Id.*)

IV.   **The October 31, 2019, Administrative Hearing**

Garcia appeared with counsel for an administrative hearing before ALJ Miller on October 31, 2019. (R. 29-60.)

A.   **Plaintiff's Testimony**

Garcia testified that she lived by herself and her source of income was through public assistance, but she would be applying for early retirement. (R. 40.) Garcia testified that both her medical and mental health issues prevented her from gainful employment. (R. 41.) Garcia testified that starting before December 2014, she was having problems with alcohol, caused by her psychiatric condition, and was self-medicating. (R. 51-52.) Garcia testified that her drinking problem, which stemmed from trauma and psychiatric issues, caused her to lose her career as a

substance abuse counselor. (R. 52-53.) Garcia also testified that she considered her condition a disease and alcohol a symptom, but she had been in rehab and had been treated for it. (R. 55.)

Regarding her physical impairments, Garcia testified that she had degenerative joint disease as well as arthritis in both hands, though it was worse in the right hand. (R. 41.) Garcia testified that she had a right hip replacement in 2009 and was waiting to do the left hip because she could not do them at the same time due to the fact she lived alone. (R. 41, 42, 53.) Because her fingers hurt, Garcia testified she could use a pen to write and could, with limits, use a computer or tablet to type, but it took work to use her hands to tie her own shoes. (R. 41-42.) Garcia testified that she could use her fingers for maybe fifteen minutes before she had to stop using them. (R. 42.) Garcia also testified that she had a problem with her kidney in August 2016 when she first went into detox although she believed it had resolved. (R. 45-46.) Garcia testified that she used a cane when the pain was intense, especially in certain weather such as the rain. (R. 49.) Garcia testified she started using the cane about a year ago after getting it from a friend since she had pain in her groin area on the right side where she had her hip replacement. (R.49-50.)

As for her mental impairments, Garcia testified that depression, anxiety, and PTSD prevented her from working. (R. 46.) She testified she was taking 100 mg of Trazadone at night. (*Id.*) Garcia further testified that she believed she had PTSD since she was a child after she found her father in the bathroom after committing suicide, but she was never diagnosed when she was young. (*Id.*) Her family problems and losing four brothers in the past five years had also contributed to the PTSD. (*Id.*) Garcia testified that she enrolled at IDCC in 2017 for treatment but

was switching to a provider in the Bronx where she would get weekly therapy and have monthly psychiatric appointments. (R. 46-47.)

Garcia testified that through treatment she believed she had gotten better, and on the day she testified, she was six weeks sober following a relapse. (R. 47-48.) However, Garcia testified that her depression and anxiety were worse when she did not drink alcohol because she felt hopeless and worthless and experienced constant fear on transportation creating panic attacks. (R. 48, 49.) Although she brought herself to the hearing, Garcia testified that she experienced panic attacks when the trains were crowded or if someone was driving fast with her in the car. (R. 48-49.)

Garcia testified that her typical week was spent going to medical appointments, housing appointments, AA meetings, and watching sports with friends. (R. 50.) Garcia testified that she was able to do her own cooking and laundry, but was limited in her ability to do her own grocery shopping since she could not carry too much. (R. 50-51.) Garcia testified that she could stand for "like half an hour," could walk three or four blocks at one time and could lift or carry forty pounds at one time. (R. 51.) Garcia testified that her mental health issues prevented her from working more than her physical health issues. (R. 53-54.) However, Garcia testified that her physical problems from 2018 had become more significant in preventing her from working. (R. 54.) Garcia testified that she started to have memory loss due to both an attack in 2016 as well as the alcohol abuse. (R. 55.) Finally, Garcia testified that if she could work, she would. (R. 55-56.) She testified that she had been working since she was fifteen, but due to her short-term memory problems she could no longer do her prior clinical work. (*Id.*)

**B.    Vocational Expert Testimony**

Vocational Expert ("VE") Elaine Curtanic also testified at the hearing. (R. 58-59.) ALJ Miller asked the VE if she could summarize Garcia's past work, and the VE stated the position was a case aide (DOT number 195.367-010) with an SVP of 3[18] which is a semi-skilled position at the light physical exertional level. (R. 58.)

**V.    ALJ Miller's Decision and Appeals Council Review**

Applying the Commissioner's five-step sequential evaluation, *see infra* Legal Standards Section II, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since November 1, 2013, the alleged disability onset date. (R. 14.)

At step two, the ALJ determined that the following impairments were severe: degenerative disc disease of the lumbar spine, degenerative joint disease of the right hip status-post right total hip replacement, osteoarthritis of the bilateral hands, and hypertension. (R. 14.) The ALJ noted there was no direct medical evidence of an impairment on or before December 31, 2014 and there was little evidence that the physical impairments were debilitating on or before that date. (*Id.*) The ALJ found that Garcia's kidney impairment was not medically determinable due to lack of evidence and her alopecia and hypertriglyceridemia were not severe because there was limited medical evidence regarding those conditions and they did not appear to limit Garcia's physical ability to do basic work activities. (R. 15.)

---

[18] "'SVP' stands for 'specific vocational preparation,' and refers to the amount of time it takes an individual to learn to do a given job . . .. SVP uses a scale from 1 to 9 and the higher the SVP number the greater the skill required to do the job." *Urena-Perez v. Astrue*, No. 06-CV-02589 (JGK) (MHD), 2009 WL 1726217, at *20 (S.D.N.Y. Jan. 6, 2009) (citations omitted), *report and recommendation adopted as modified*, 2009 WL 1726212 (S.D.N.Y. June 18, 2009).

The ALJ found that Garcia's "mental impairments of depressive disorder, adjustment disorder with mixed anxiety and depressed mood, and alcohol use disorder, considered singly and in combination, [did] not cause more than minimal limitation in [her] ability to perform basic mental work activities and [were] therefore nonsevere." (R. 15.) In his determination, the ALJ considered the four broad functional areas of mental functioning set out in "paragraph B" and found that Garcia had mild limitations in understanding, remembering or applying information and concentrating, persisting or maintaining pace, and no limitations in interacting with others or adapting or managing oneself. (*Id.*)

In reaching this determination, the ALJ explained that he found Dr. Brown's and Dr. Broska's opinions persuasive because Dr. Brown, although a non-examining source, was an expert and Dr. Broska was a duly qualified psychological consultative examiner who performed a detailed clinical interview and comprehensive mental status examination. (R. 17.) The ALJ found the two opinions were consistent with each other and supported by Dr. Broska's examination and Dr. Brown's observations. (*Id*.) The ALJ also found that Dr. Siller's contemporaneous progress notes "confirmed the opinion of Dr. Brown that [Garcia's] symptoms were related to homelessness and similar life stressors, rather than resulting from underlying mental health impairments." (*Id*.) The ALJ found that the "Medical Source Statement/Mental" questionnaire completed by Garcia's therapist and signed by Dr. Siller was unpersuasive. (R. 17.) The ALJ explained that the mental status examination findings by both Dr. Broska and Dr. Siller showed mild or no impairments in memory and therefore, the opinion that Garcia could not understand, remember or carry out instructions was not supported by the objective record. (*Id*.) The ALJ also

found that the opinion was not supported by Garcia's statements to Dr. Siller, "which show[ed] problems with situational stress, but not difficulty with memory or concentration or focus." (*Id.*)

At step three, the ALJ found that Garcia did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 18.) Specifically, the ALJ found the spinal impairment did not meet the criteria of Listing 1.04 since Dr. Meisel found normal strength, sensation and reflexes in the upper and lower extremities and the x-ray shows the arthroplasty was in place. (*Id.*) Furthermore, Garcia could ambulate "effectively," so she did not meet the Listing 1.02A and the bilateral hand impairments did not meet the criteria for Listing 1.00. (*Id.*) As for the hypertension, the ALJ found the condition did not cause the abnormalities required within Listing 4.00. (*Id.*)

The ALJ then assessed Plaintiff's RFC, determining that she could perform a range of light work in which she could lift and/or carry twenty pounds occasionally, ten pounds frequently, stand/walk/sit with normal breaks for six hours of an eight-hour workday, and could only frequently grasp, turn, twist, handle, and perform fine/gross manipulations with her bilateral upper extremities. (R. 18.) The ALJ noted there was no treatment for physical conditions in the record until 2018. (R. 19.) The ALJ found Garcia's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (R. 20.) The ALJ considered Garcia's activities of daily living, which he found were not indicative of a significant loss of independence, and also referenced Garcia's "very conservative" course of treatment. (R. 21.)

With respect to the medical opinion evidence, the ALJ found Dr. Lee's opinion that Garcia could perform the full range of light work "most persuasive" because he was "an expert for the purposes of medical record review and knowledge of disability program rules." (R. 22.) The ALJ was less persuaded by Dr. Meisel's opinion that Garcia would have some non-exertional limitations because the physical examination findings from Dr. Meisel and Garcia's primary care providers "[did] not show the kind of abnormalities that would result in significant difficulty with postural activity." (R. 22-23.)

Moving on to step four, the ALJ found, based on the VE's testimony, that Garcia had past relevant work as a case aide. (R. 23.) The ALJ further found that "[t]his work did not require the performance of work-related activities precluded by [Garcia's] residual functional capacity." (*Id.*) Therefore, the ALJ concluded that Garcia was able to perform her previous work as it was actually and generally performed. (*Id.*) Accordingly, the ALJ determined the Garcia had not been under a disability from November 1, 2013 through the date of the ALJ's decision. (*Id.*)

## LEGAL STANDARDS

### I.   Standard Of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am., Local 537*, 47 F.3d 14, 16 (2d Cir. 1994) (citing Fed. R. Civ. P. 12(c)). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

"The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." *Ulloa v. Colvin*, No. 13-CV-04518 (ER), 2015 WL 110079, at *6 (S.D.N.Y. Jan. 7, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision[.]" *Ellington v. Astrue*, 641 F.Supp.2d 322, 328 (S.D.N.Y. 2009); *accord Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987). A court must set aside legally erroneous agency action unless "application of the correct legal principles to the record could lead only to the same conclusion," rendering the errors harmless. *See Garcia v. Berryhill*, No. 17-CV-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018) (quoting *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)).

Absent legal error, the ALJ's disability determination may be set aside only if it is not supported by substantial evidence. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (vacating and remanding ALJ's decision). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, "[t]he substantial evidence standard is a very deferential standard of review—even more so than the clearly erroneous standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder *would have to conclude otherwise*." *Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), *as amended* (Apr. 30, 2019) (summary order) (emphasis in original) (citation and internal quotation marks omitted). If the findings of the

Commissioner as to any fact are supported by substantial evidence, those findings are conclusive.

*Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

II.     **Determination Of Disability**

A person is considered disabled for benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In determining whether an individual is disabled, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment

that meets the duration requirement . . . [continuous period of 12 months], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 [(the "Listings")] . . . and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (internal citations omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

After the first three steps (assuming that the claimant's impairments do not meet or medically equal any of the Listings), the Commissioner is required to assess the claimant's RFC "based on all the relevant medical and other evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The claimant bears the burden of proof as to the first four steps. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999) (citation omitted). It is only after the claimant proves that she cannot return to work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given the claimant's RFC, age, education and past relevant work experience. *Id.* at 50-51.

III.   <u>**Regulations Regarding Consideration of Medical Opinions and Prior Findings For**</u>
       <u>**Applications Filed on Or After March 27, 2017**</u>

Under the regulations applicable to Garcia's claim, the Commissioner no longer will "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, when evaluating the persuasiveness of medical opinions, the Commissioner will consider the following five factors: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." *Id*. §§ 404.1520c(c), 416.920c(c). Using these factors, the most important of which are supportability and consistency, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id*. §§ 404.1520c(b), 416.920c(b).

 With respect to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive

the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. §§ 404.1520c(c)(2), 416.920c(c)(2). While the ALJ "may, but [is] not required to, explain how [he] considered" the factors of relationship with the claimant, the medical source's specialization, and other factors, the ALJ "will explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." *Id*. §§ 404.1520c(b)(2), 416.920c(b)(2) (emphasis added).

## DISCUSSION

Plaintiff argues that remand is required because: (1) the ALJ failed to properly consider the medical opinion evidence; (2) the ALJ's step-two determination that Garcia's mental impairments were not severe was not supported by substantial evidence[19] and, in any event, the ALJ erred by failing to consider these impairments in his RFC determination; and (3) the ALJ's RFC determination was not supported by substantial evidence; and (4) the ALJ erred in finding that Garcia could perform her past relevant work. (Pl.'s Mem. at 10-22.) For the reasons set forth below, the Court finds that the ALJ erred by failing to consider Plaintiff's mental impairments in making the RFC determination, such that remand is required.

## I.   The ALJ's Consideration Of Garcia's Mental Impairments

Plaintiff first argues that the ALJ erred in finding the opinions of Dr. Brown and Dr. Broska more persuasive than that of Dr. Siller and, as a result, the ALJ's subsequent determination that Garcia's mental impairments were non-severe is not supported by substantial evidence. (Pl.'s Mem. at 13-17.) "Courts in this District have clarified that the opinions of non-examining State

---

[19] Plaintiff does not appear to challenge the ALJ's assessment of her alcohol use disorder, which was largely in remission. (*See* Pl.'s Mem., ECF No. 25, at 16-17 (discussing depression, anxiety and PTSD).)

agency medical consultants . . . may constitute 'substantial evidence' as long as those opinions are substantially supported by the record." *Gavin v. Comm'r of Soc. Sec.*, No. 19-CV-05843 (KHP), 2020 WL 5105177, at *6 (S.D.N.Y. Aug. 31, 2020) (citing *Pappas v. Saul*, 414 F. Supp. 3d 657, 674 (S.D.N.Y. 2019) (collecting cases)). In addition, the opinions of consultative examiners may constitute substantial evidence, *see Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 738-40 (S.D.N.Y. 2018) (substantial evidence, including opinions of consultative examiners, supported step-two severity determination), although the Second Circuit repeatedly has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Rucker v. Kijakazi*, No. 21-621-CV, 2022 WL 4074410, at *6 (2d Cir. Sept. 6, 2022).

As an initial matter, the Court finds that the ALJ's characterization of Dr. Brown's opinion was flawed because, although Dr. Brown noted, "based on evidence in [the] file[,]" that Plaintiff's symptoms were related to homelessness and that she reported being unable to work due to homelessness," he did not opine that Plaintiff's symptoms were caused by homelessness or other stressors, as opposed to an underlying mental impairment, as the ALJ appears to have concluded. Dr. Brown's statements regarding homelessness reflect Dr. Broska's report, which appears to have been the only record considered by Dr. Brown from the relevant time period. (*See* R. 71.) However, Dr. Brown also noted that the most recent medical evidence in the record that he reviewed (from January 2017) mentioned mild depression and that it was "unclear" how evidence that Plaintiff had been living in a halfway house for 13 months and then moved to an apartment was consistent with the report that she had not been able to work due to homelessness. (R. 71-72.) These statements do not support the ALJ's conclusion that Plaintiff's

symptoms were not caused by an underlying mental impairment.[20] Accordingly, the Court finds

that the ALJ erred to the extent he relied upon Dr. Brown's opinion to support his reading of Dr.

Siller's treatment notes (and therefore discount her opinion) and conclude that Plaintiff's

symptoms were non-severe. (R. 16-17.) The Court need not decide, however, whether the ALJ's

step-two determination is otherwise supported by substantial evidence because I agree with

Plaintiff that, even if it is, the ALJ failed to properly consider Garcia's mental impairments when

determining her RFC, which is an independent ground for remand.

"Even where 'substantial evidence supports the ALJ's finding that a claimant's mental

impairment was nonsevere, it would still be necessary to remand . . . for further consideration

where the ALJ failed to account for the claimant's mental limitations when determining her RFC.'"

*Amparo v. Comm'r of Soc. Sec.*, No. 20-CV-10285 (JMF) (SDA), 2022 WL 3084482, at *10 (S.D.N.Y.

July 19, 2022), *report and recommendation adopted*, 2022 WL 3084380 (S.D.N.Y. Aug. 3, 2022)

(quoting *Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012)); *see also* 20 C.F.R. §§

404.1545(a)(2), 416.945(a)(2) ("We will consider all of your medically determinable impairments

of which we are aware, including your medically determinable impairments that are not 'severe

[ ]' . . . when we assess your [RFC][.]"). Here, the ALJ did not consider the effects or limitations

cause by Plaintiff's medically determinable mental impairments in reaching his RFC

determination. The ALJ explicitly omitted discussion of Plaintiff's testimony regarding her mental

health impairments in his RFC determination, noting that they "have previously been found to

be non-severe earlier in this decision." (R. 19.) The ALJ then stated, "I will now address the

---

[20] As Plaintiff points out, major depressive disorder can occur with or without specific stressors, but is distinct, more severe and more likely to be associated with problems functioning than mere situational stress. (*See* Pl.'s Mem. at 14 n.10.)

medical evidence of record with regard to her physical impairments." (*Id.*) However, the ALJ's assessment at step two did not relieve him of the requirement to discuss Plaintiff's mental health impairments in formulating the RFC. *See Amparo*, 2022 WL 3084482, at *10 (citing cases); *see also Garcia v. Comm'r of Soc. Sec.*, No. 20-CV-07539 (PAE) (SLC), 2022 WL 970566, at *8 (S.D.N.Y. Mar. 31, 2022) ("To the extent the Commissioner suggests that a review of medical evaluations for step two purposes obviates the need to consider them later in determining the claimant's RFC, that is incorrect[.]"); *David Q. v. Comm'r of Soc. Sec.*, No. 20-CV-01207 (MWP), 2022 WL 806628, at *5 (W.D.N.Y. Mar. 17, 2022) (step-two analysis and RFC determination are "analytically distinct").

The Commissioner argues that the ALJ considered Plaintiff's nonsevere impairments, as evidence by his discussion of Plaintiff's activities of daily living and course of treatment. (*See* Comm'r Mem., ECF No. 30, at 20 (citing R. 21-22).). However, the Court finds those references insufficient to explain how the ALJ considered Plaintiff's mental impairments or the basis for his decision not to include any mental impairments in Plaintiff's RFC. *See Rousey*, 285 F. Supp. 3d at 741 (ALJ's two references to plaintiff's psychological condition insufficient to explain how RFC determination included consideration of nonsevere mental impairments); *see also Laura Anne H. v. Saul*, No. 20-CV-00397 (TWD), 2021 WL 4440345, at *11 (N.D.N.Y. Sept. 28, 2021) ("The ALJ may find that Plaintiff's mental impairments are inconsequential and, thus, reject the need to incorporate mental limitations into the RFC – but he must explain his reasoning for doing so.")). Notably, the ALJ did not address Dr. Brown's opinion that, despite mild limitations in certain areas of mental functioning, Plaintiff "appear[ed] to be able to perform jobs with simple tasks." (R. 71.) Nor did he consider relevant portions of Dr. Siller's opinion, including that Plaintiff had marked

limitations in her ability to deal with stress or semi-skilled and skilled work.[21] (R. 298.) Thus, the ALJ failed to engage in the type of more detailed assessment that an ALJ is required in reaching an RFC determination. *See* SSR 96-8P, 1996 WL 374184, at *4 (S.S.A. July 2, 1996) ("The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments and summarized on the [Psychiatric Review Technique Form].").

Finally, "[a]lthough an ALJ's failure to mention non-severe impairments in formulating the RFC may be considered harmless error absent evidence that these impairments contributed to any functional limitations" *Amparo*, 2022 WL 3084482, at *11, that is not the case, where, as here, the ALJ found at least mild limitations in areas of mental functioning. *See id.* (citing cases). Significantly, consideration of Plaintiff's metal impairments on her RFC could have impacted the ALJ's determination that she was able to perform her past work, which was semi-skilled. *See, e.g.*, *Lorraine K.*, 2022 WL 1115456, at *3 (semiskilled work may be inconsistent with mild limitations in mental functioning). For these reasons, I find that the ALJ erred by failing to adequately consider Plaintiff's mental impairments in formulating an RFC determination.

## II.   **Plaintiff's Remaining Arguments**

With respect to the ALJ's consideration of the medical opinion evidence regarding Plaintiff's physical impairments, the Court agrees with the Commissioner that any error with respect to Dr. Meisel's opinion was harmless given that moderate limitations in, *inter alia*,

---

[21] In finding in finding Dr. Siller's opinion "not persuasive" at step two, the ALJ only considered aspects of the opinion regarding memory, concentration and focus. (*See* R. 17.)

standing, walking and bending do not preclude performance of light work. *See Gavin v. Comm'r of Soc. Sec.*, No. 19-CV-5843 (KHP), 2020 WL 5105177, at *7 (S.D.N.Y. Aug. 31, 2020) (citing cases). Because I find that the ALJ erred by failing to properly consider Plaintiff's mental impairments in making an RFC determination, I do not address Plaintiff's arguments that the RFC determination is not supported by substantial evidence. However, given the limited evidence regarding Plaintiff's physical impairments for the time period relevant to her SSI claim and, in particular, the lack of any medical opinion regarding Plaintiff's manipulative limitations, on remand, the ALJ should consider whether additional medical opinion evidence regarding the functional limitations caused by Plaintiff's severe physical impairments is warranted.

## CONCLUSION

For the reasons set forth above, Plaintiff's motion (ECF No. 24) is GRANTED and the Commissioner's cross-motion (ECF No. 29) is DENIED. The Court remands this case for further proceedings before the SSA. The Clerk of Court is respectfully directed to enter judgment and close this case.

**SO ORDERED.**

Dated:       New York, New York
             September 14, 2022

_____
STEWART D. AARON
United States Magistrate Judge